UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

JOVAN WILKINS,

                            Petitioner,

       v.                                         9:24-CV-0351
                                                   (GTS)

MARK J. MILLER, Superintendent,

                        Respondent.

_____

APPEARANCES:                                     OF COUNSEL:

JOVAN WILKINS
Petitioner Pro Se
19-A-0343
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582

HON. LETITIA JAMES                           JAMES FOSTER GIBBONS, ESQ.
Attorney for Respondent                     Ass't Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

GLENN T. SUDDABY
United States District Judge

**DECISION and ORDER**

## I.      INTRODUCTION

       Petitioner Jovan Wilkins seeks federal habeas relief pursuant to 28 U.S.C. § 2254.

Dkt. No. 1, Petition ("Pet.").[1]  Respondent opposed the Petition.  Dkt. No. 17, Response; Dkt.

No. 17-1, Memorandum of Law in Support; Dkt. No. 17-2, State Court Records; Dkt. No. 17-

---

[1]  For the sake of clarity, with one limited exception, citations to all parties' filings refer to the pagination generated by CM/ECF, the Court's electronic filing system.  However, citations to the State Court Record ("SCR"), Dkt. No. 17-2, reference the Bates-stamp at the bottom-center of each page as each exhibit is separately and consecutively paginated.

3, State Court Transcripts.  Petitioner filed a reply.  Dkt. No. 23, Reply.  For the reasons which follow, the Petition is denied and dismissed.

## II.   RELEVANT BACKGROUND

### A.   State Court Criminal Proceedings

#### 1.   Indictment

On March 29, 2018, an Ulster County grand jury charged petitioner with one count each of Assault in the First Degree and Attempted Murder in the Second Degree for events occurring on December 3, 2017.  SCR at 9-10.

#### 2.   The Suppression Hearing

##### a.   Proof

On September 7, 2018, a *Huntley*/*Dunaway*/*Mapp*/audibility/visibility hearing was held, pursuant to a stipulation signed by both parties, determining the admissibility of (1) petitioner's statements to the police; (2) evidence seized from petitioner's person, car, and cell phone; and (3) petitioner's recorded telephone calls made while he was in pretrial detention.  SCR at 47-48 (Stipulation); Dkt. No. 17-4 at 108-312 (Hearing transcript).  Petitioner was represented by Ulster County Public Defender Bryan Rounds.  Dkt. No. 17-4 at 108.

The People called New York State Troopers Connor Treacy and Robert Cocuzza; New York State Police Investigators Matthew Terwilliger, Matthew Bresnahan, and Timothy Jordan; and Ulster County Corrections Officer Christopher Howe.  Dkt. No. 17-4 at 131-61 (Treacy); Dkt. No. 17-4 at 162-82 (Cocuzza); Dkt. No. 17-4 at 182-230 (Terwilliger); Dkt. No. 17-4 at 230-42 (Bresnahan); Dkt. No. 17-4 at 242-63 (Jordan); Dkt. No. 17-4 at 264-294 (Howe).

2

In sum and substance, the People presented evidence that, at about 5:00 a.m. on December 3, 2017, Trooper Treacy responded to a hospital where stabbing victim David Huggan was undergoing surgery for life-threatening injuries.  Dkt. No. 17-4 at 132-36.  While Huggan was in surgery, Trooper Treacy interviewed Huggan's cousin, Odain Irving, and their friend, Terrance Warren.  Dkt. No. 17-4 at 136.  Irving told Trooper Treacy that Huggan intervened in a fight, to assist Warren who was being "jumped", and instead Huggan became the target of the assault.  Dkt. No. 17-4 at 140.  Irving identified the petitioner as the only person to be near Huggan and make physical contact with him.  Dkt. No. 17-4 at 136-37.  While Irving did not see a knife, he did observe petitioner repeatedly hit Huggan.  Dkt. No. 17-4 at 154-59.  Further, Irving said that Huggan identified petitioner as the one that stabbed him when he approached Irving, after the fight, profusely bleeding with "his guts . . . hanging out.".  Dkt. No. 17-4 at 138.

Concurrently, Trooper Cocuzza reported to a different hospital to interview another stabbing victim.  Dkt. No. 17-4 at 163-64.  Upon arrival, Trooper Cocuzza spoke with the petitioner and his mother and noticed that petitioner was receiving treatment for an injury to his hand.  Dkt. No. 17-4 at 164.  At that time, Trooper Cocuzza believed that petitioner could also be a crime victim.  Dkt. No. 17-4 at 165.  Trooper Cocuzza stayed with petitioner until he was later relieved by Investigators Terwilliger and Bresnahan.  Dkt. No. 17-4 at 168, 177-81, 189.

Around 7 a.m., Trooper Treacy called Investigator Terwilliger and explained that Irving had accused petitioner of stabbing Huggan.  Dkt. No. 17-4 at 188-89.  Investigator Terwilliger was joined by Investigator Bresnahan.  Dkt. No. 17-4 at 188-89, 232.  The Investigators returned to petitioner's room and asked him to return to the Highland Troopers Barracks for a

further interview after he was finished at the hospital.  Dkt. No. 17-4 at 189-90.  Petitioner agreed and, at 7:45 a.m., he accompanied the Investigators back to the barracks.  Dkt. No. 17-4 at 189-90, 233-34.

Upon arrival, petitioner was issued *Miranda* warnings, and a videotaped interview was conducted.  Dkt. No. 17-4 at 191-92.  During the interview, petitioner agreed to take a polygraph test, which was subsequently administered by Investigator Jordan.  Dkt. No. 17-4 at 237, 243-44.  After the polygraph concluded, petitioner underwent a third interview with Investigator Terwilliger before being placed under arrest by Trooper Cocuzza.  Dkt. No. 17-4 at 168, 192-95, 238, 250.

Finally, Corrections Officer Howe explained how notifications are posted and provided to inform inmates at the Ulster County Jail that their phone calls are being recorded.  Dkt. No. 17-4 at 265-68.

Petitioner did not present any witnesses or evidence.  Dkt. No. 17-4 at 294.

### b.    Decision

In a subsequent written decision, the trial court denied suppression of petitioner's statements to police.  SCR at 67-68, 70.  Specifically, the county court held that law enforcement "were justified in approaching, speaking to and securing a supporting deposition from the [petitioner] based upon their belief he was a crime victim;" petitioner "voluntarily agreed . . . to be interviewed [at the Troopers barracks];" and once petitioner was at the barracks, the statements of Irving identifying petitioner as the assaulter provided ample probable cause for his custody. SCR at 67.  Further, *Miranda* warnings were not required at the hospital and, when they were given prior to his custodial interrogations and polygraph, petitioner knowingly, intelligently and voluntarily waived his *Miranda* rights.  SCR at 68-69.

Further, the court deemed the jail calls properly recorded because petitioner "received ample notice that his calls were subject to monitoring and recording." SCR at 69.

However, the court suppressed evidence seized from the petitioner's cell phone because the "search warrant did not establish probable cause to believe that evidence related to this crime would be found on this cell phone." SCR at 69. Additionally, in a footnote to the written decision, the trial court stated

> [a]t the conclusion of the hearing, the [c]ourt directed the [petitioner] to submit written arguments in support of its motion to suppress the [petitioner's] statements pursuant to the *Huntley* and *Dunaway* decisions. No such arguments were submitted. Accordingly, as an alternative holding, the [c]ourt finds that the [petitioner] has waived its right to a determination of these motions by the [c]ourt.

SCR at 70.

### 3.      The Trial

Petitioner's jury trial commenced on November 7, 2018, in Ulster County Court. Dkt. No. 17-4 at 545. Petitioner was represented by a different attorney, Ulster County Public Defender Mikael Cohn. *Id.*

### a.      The Prosecution's Case

The facts which follow were based on the testimony offered by the prosecution. In the late evening hours of December 2, 2017, David Huggan, his cousin, Odain Irving, and their friend, Terrance Warren, all went to a house party to celebrate the newly elected Dutchess County Legislator. Dkt. No. 17-4 at 579-81, 639-40. As Huggan and Irving were leaving the party, they saw their friend Warren being assaulted by three men, two of which were petitioner and his brother, Kamel Wilkins.[2] Dkt. No. 17-4 at 582, 599-600, 641, 673. Huggan

---

[2] Irving could confidently identify petitioner because Irving knew him since they went to high school and played football together. Dkt. No. 17-4 at 644-45.

ran over to aide his friend and break up the fight; however, as soon as he separated the individuals he felt a sharp, stabbing pain in his lower back.  Dkt. No. 17-4 at 583-85.  Huggan turned and faced his attacker, who pulled Huggan in close to him, and Huggan saw a knife before he was stabbed twice in the abdomen.  Dkt. No. 17-4 at 585, 599-600, 611-12, 642.  Irving also observed petitioner striking Huggan in the lower back, pulling Huggan close to him, and striking him in the abdomen.  Dkt. No. 17-4 at 641-42.

Huggan broke free and attempted to escape, but he was tackled from behind and placed in a headlock by petitioner's brother.  Dkt. No. 17-4 at 586, 630-31.  That was when Huggan saw petitioner pick up the knife, approach Huggan, and stab him again in the back.  Dkt. No. 17-4 at 586, 599-600.  Huggan was eventually released from the headlock and hypothesized that it was because petitioner accidentally stabbed his brother, who had been holding Huggan.  Dkt. No. 17-4 at 631.

Eventually, Huggan brought himself to his feet when he observed petitioner throwing his arms into the air, in what Huggan characterized as a celebratory gesture.  Dkt. No. 17-4 at 587-89.  Huggan found Irving, who was assisting Warren to his feet, and told Irving he had been stabbed.  Dkt. No. 17-4 at 589-90.  Huggan was bleeding profusely and part of his intestines were exposed outside of his body.  Dkt. No. 17-4 at 596, 642-43. Huggan told Irving it was petitioner who had stabbed him, and then Irving immediately took Huggan to the hospital.  Dkt. No. 17-4 at 590, 643.

Huggan arrived at the Mid-Hudson Emergency Department, in critical condition, and needed emergency surgery due to his nine stab wounds, profuse bleeding, exposed intestines, punctured lung and spleen, and lacerated diaphragm.  Dkt. No. 17-4 at 739-754.  Huggan's injuries were all life threatening.  Dkt. No. 17-4 at 753.

At the same time Huggan was receiving critical care, Trooper Cocuzza and Investigator Terwilliger reported to Vassar Brother's Hospital to receive statements from two other stabbing victims, petitioner and Kamal.  Dkt. No. 17-4 at 673, 684-85.  Kamal was uncooperative, specifically refusing to give law enforcement a description of his attacker and indicating that he did not want to pursue criminal charges against the perpetrator.  Dkt. No. 17-4 at 673-74, 685.  Petitioner was similarly unable to give a description of who stabbed his brother.  Dkt. No. 17-4 at 674.

Conversely, petitioner agreed to be interviewed on several occasions by law enforcement.  Dkt. No. 17-4 at 686.  As those interviews progressed, petitioner's story changed dramatically.  Initially, petitioner said he never saw or possessed a knife during the fight.  Dkt. No. 17-4 at 686-88, 885-87.  Then, petitioner shared that Warren stabbed his brother.  Dkt. No. 17-4 at 866, 887-88, 897.  In an attempt to protect both Kamel and himself during that attack, petitioner injured when his hand when he fought back and even temporarily possessed the knife for approximately thirty seconds.  Dkt. No. 17-4 at 865-71, 889-90.  Finally, petitioner admitted to picking the knife up from the ground, holding it, and swinging his hands wildly and frantically; however, in every iteration petitioner maintained that he did not make contact with any other person.  Dkt. No. 17-4 at 890-92.

Two forensic scientists, Sarah Kloss and Lisa Sheridan, also testified.  Dkt. No. 17-4 at 766-800.  Kloss tested petitioner's t-shirt for blood, and the results were positive.  Dkt. No. 17-4 at 776-77.  The shirt was then sent to Sheridan for DNA analysis.  Dkt. No. 17-4 at 788.  Sheridan's conclusions, shown in chart-form to the jury, concluded that Huggan's DNA was on the back of petitioner's shirt.  Dkt. No. 17-4 at 797-98.

7

During summations, the People outlined their version of the case.  Dkt. No. 17-4 at 1091-1113.  Specifically, the People identified three stages to the assault on Huggan: the first with petitioner stabbing him five times in the back; the second with petitioner facing Huggan, drawing him close, and stabbing him twice in the abdomen; and the third, while Huggan lie on the ground, was petitioner stabbing Huggan multiple times in the back.  Dkt. No. 17-4 at 1091-95.  Consistent with Huggan's statements and his injuries were Irving's observations from that evening.  Dkt. No. 17-4 at 1096-98.  Measured against that consistency were petitioner's inconsistent recollections from the fight, starting with over twenty denials that he never saw or possessed a weapon, to an ultimate admission by petitioner that he justifiably wielded the knife for what the prosecution submitted was an implausible case of self-defense.  Dkt. No. 17-4 at 1104-1112.

**b.      The Petitioner's Defense**

The facts which follow were based on the testimony offered in support of petitioner's defense.  Petitioner's brother, Kamel, confirmed that he and the petitioner were at the same house party as Huggan, Irving, and Warren, where a massive fight commenced.  Dkt. No. 17-4 at 941-42.  Alyssa Jaccino, a friend of Kamel's from high school, also witnessed the fight.  Dkt. No. 17-4 at 976-77.  Kamel indicated that he attempted to break up the fight and then got tackled by a larger man.  Dkt. No. 17-4 at 944.  Kamel curled into a ball, while he was being kicked and punched, and yelled for petitioner to help him.  Dkt. No. 17-4 at 944-45, 980-81.  Kamel and Jaccino both identified Warren as one of the men assaulting Kamel.  Dkt. No. 17-4 at 945, 978-80.

Eventually petitioner came to Kamel's aid and was able to get Kamel off the ground and back to his car.  Dkt. No. 17-4 at 945-46.  Kamel asked petitioner to take him to the

hospital for his injuries, and petitioner complied.  Dkt. No. 17-4 at 947-48, 981.  Jaccino also said that Warren started to assault her that night, and that she reported the assault to law enforcement who failed to follow up on her complaints.  Dkt. No. 17-4 at 982-85.

Kamel was treated for three stab wounds, one to his chest, one to his mid-back, and one to his lower back.  Dkt. No. 17-4 at 950-51.  Kamel expressed his fear of retaliation and explained that was why he did not disclose the identities of his attackers to law enforcement.  Dkt. No. 17-4 at 948.  Kamel emphatically stated that Warren stabbed him and had no intention of stopping, consequently, petitioner's actions saved Kamel's life and are the only reason why Kamel was still alive.  Dkt. No. 17-4 at 951.

During petitioner's summation, his counsel outlined various questions integral to petitioner's defense.  Counsel asks the jury why petitioner would viciously attack a person he does not know?  Dkt. No. 17-4 at 1070-71.  Counsel asks where is Warren, the man who inspired Huggan's heroic intervention?  Dkt. No. 17-4 at 1071.  Counsel asks how stab wounds would have appeared in the areas they did if petitioner and Huggan were facing each other and why blood was not found in certain areas of petitioner's shirt if the fight went the way Huggan described?  Dkt. No. 17-4 at 1071-73, 1086-87.  Counsel asks why petitioner would be celebrating in the midst of accidentally stabbing his own brother?  Dkt. No. 17-4 at 1072.  Instead, petitioner's counsel proffered a different version of events centered on a terrified older brother doing whatever it took to save his younger brother and himself.  Dkt. No. 17-4 at 1087-88.

### c.      Jury Charge and Verdict

Petitioner's trial counsel successfully requested that the judge advise the jury of petitioner's right not to testify, as well as the inclusion of a justification and missing witness charge.  Dkt. No. 17-4 at 1028-43, 1133-39.

Ultimately, the jury convicted petitioner on the first count, Assault in the First Degree, and acquitted him on the second count, Attempted Murder in the Second Degree.  Dkt. No. 17-4 at 1227-28.

### d.    Sentencing

On January 18, 2019, petitioner appeared for sentencing.  Dkt. No. 17-4 at 1240-1309. Petitioner's counsel unsuccessfully renewed his trial motion to set aside the verdict.  Dkt. No. 17-4 at 1242-1245.  Further, after hearing the prosecution's arguments about petitioner's prior arrests on domestic violence allegations, petitioner's counsel successfully argued for the Court not to consider those issues because the records were subsequently sealed.  Dkt. No. 17-4 at 1267-1293.  However, the court did consider statements petitioner had made regarding the incident including admissions, via text message, which said "I was the one stabbing[ but] I ain't trying to catch another charge" and "I had my gun, ain't want a body though."  Dkt. No. 17-4 at 1270.

Ultimately, petitioner was sentenced to a determinate term of eighteen years in state prison and five years of post-release supervision.  Dkt. No. 17-4 at 1309-1310.

### B.    Post-Conviction Motions

Petitioner filed a counseled direct appeal arguing that his judgment of conviction must be vacated because (1) the People violated their *Brady* obligations when they failed to disclose material impeachment evidence of Lisa Sheridan's misconduct; (2) the verdict for Assault in the First Degree was against the weight of the evidence; and (3) petitioner's

attorneys were constitutionally ineffective for failing to submit any argument in support of petitioner's suppression motion or make appropriate objections during the cross-examination of Sheridan. SCR at 1196-1239.

On September 9, 2021, while petitioner's direct appeal was pending, petitioner also filed a counseled motion to vacate the judgment, pursuant to New York Criminal Procedure Law §440.10, reiterating his claims that he was entitled to relief because his Due Process Rights were violated when the People failed to disclose *Brady* evidence. SCR 178-207, 788-802. Specifically, as outlined by the Ulster County Court decision, petitioner argued that impeachment information about Lisa Sheridan's professional discipline after cheating on a qualification exam and being dishonest during the subsequent investigation should have been disclosed to him. SCR at 774. The People conceded that the impeachment material was not provided, however, argued that there was no reasonable possibility that, even if it had been disclosed, a different verdict would have resulted. SCR at 775.

The County Court agreed that the disciplinary records were impeachment material that was wrongly withheld from petitioner. SCR at 777. However, petitioner failed to satisfy the prejudice prong of the analysis. SCR at 783. Specifically, the court explained that (1) the disciplinary records concerned general impeachment matters unrelated to petitioner's guilt or innocence; (2) petitioner's conviction was based mostly on eyewitness testimony that established petitioner was involved in the fight and attacking Huggan; and (3) petitioner's everchanging story about his contact with, and possession of, the knife ultimately ended with petitioner admittedly possessing and wielding the weapon. SCR at 778-782.

Petitioner filed a counseled motion to appeal.  SCR at 1139-1151.  The New York State Appellate Division, Third Department granted the motion and directed that it be decided in conjunction with petitioner's direct appeal.  SCR at 784.

The Third Department ultimately ordered that the judgment of conviction and order denying petitioner's 440 motion be affirmed.  *People v. Wilkins*, 216 A.D.3d 1359, 1367 (3d Dep't 2023).[3]  Specifically, as is relevant to the instant action, the Third Department found petitioner's arguments of constitutionally ineffective counsel unpersuasive.  *Id.* at 1364.  The Third Department held that

> Counsel who represented [petitioner] during pretrial proceedings was not ineffective based upon his contentious exchanges with County Court (Williams, J.), as there is no indication that his remarks had any adverse effect on the representation or resulted in unfavorable rulings or unfair treatment by the court . . . .  Similarly without merit is [petitioner]'s contention that pretrial counsel's failure to submit a memorandum of law in support of a motion to suppress statements he made during custodial interrogation establishes that he received deficient representation.  [Petitioner]'s brief arguments concerning the availability of potential meritorious suppression arguments are unpersuasive, and our review of the record reveals no indication that the motion had a substantial chance of success.

*Id.* at 1364 (all citations omitted).

With respect to petitioner's trial counsel, the Third Department also concluded that the representation petitioner received

> was far from deficient. To this end, the record reveals that counsel made appropriate opening and closing statements, engaged in effective cross-examination of the People's witnesses which highlighted any inconsistencies in their accounts of the altercation, successfully advocated for a missing witness charge, pursued a cogent and strategic theory based upon a justification defense, and, ultimately, counsel's efforts resulted in an acquittal of one of the two charged felonies . . . . [Petitioner]'s remaining contentions concerning the scope of trial counsel's direct and cross-examination

---

[3]  A copy of the Third Department's decision was included in the State Court Record.  SCR at 2027-2031.

12

> of certain witnesses or his failure to object to certain remarks by the People are merely reflective of [petitioner]'s disagreement as to trial counsel's strategies and tactics weighed with the benefit of hindsight.

*Wilkins*, 216 A.D.3d at 1364-65 (internal quotation marks, alterations, and citations omitted).

Finally, the Third Department addressed petitioner's allegations from his direct appeal and collateral challenge about the purported *Brady* violation created by the People's failure to disclose impeachment evidence about one of their forensic scientists. *Wilkins*, 216 A.D.3d at 1365. The People acknowledged that the material should have been turned over, accordingly, the only question was whether that evidence would have changed the outcome of the proceeding. *Id.* at 1365-66. The Third Department explained that

> [t]he resolution of this case was almost entirely dependent on the jury's credibility determinations concerning the account of the altercation and [petitioner]'s justification for his actions and, as such, the forensic scientist's testimony concerning the identification of the victim's blood on [petitioner]'s shirt was not central to the verdict. In this respect, the victim identified [petitioner] as his assailant, and there is no dispute that [petitioner] was involved in and possessed a knife during the fight. Further, the significance as to the blood found on [petitioner]'s shirt was its location on the shirt—which was testified to by the other forensic scientist pertaining to her preparation of the clippings of that shirt that were subsequently tested—rather than its origin. It is also notable that [petitioner]'s trial counsel utilized the location of the cuttings to advance his argument that the victim's account of the altercation was inconsistent with the physical proof. Under these circumstances, we find that [petitioner] has failed to show that prejudice arose because the suppressed evidence was material and that a new trial is warranted.

*Id.* at 1366-67 (internal quotation marks omitted).

Petitioner filed a counseled application for leave to appeal. SCR at 2032-2045. On September 22, 2023, the New York State Court of Appeals denied the application. *People v. Wilkins*, 40 N.Y.3d 1000 (2023).

13

## III.    PRESENT PETITION

Petitioner argues that he is entitled to federal habeas relief because (1) his trial was rendered unfair by *Brady* violations, Pet. at 2-4; and (2) his attorneys were constitutionally ineffective for failing to (a) submit an argument in his suppression motion, (b) make appropriate objections, and (c) cross-examine a witness, *id.* at 5-7.

Respondent filed an opposition arguing that the state courts reasonably determined petitioner's claims were meritless.  Dkt. No. 17-1 at 16-26.  Further, respondent contends that not all of petitioner's ineffective assistance of counsel claims are exhausted.  *Id.* at 25-26.

Petitioner filed a reply.  Dkt. No. 23.

## IV.    DISCUSSION

### A.    Generally Applicable Law

The AEDPA provides that, when a state court has adjudicated the merits of a petitioner's constitutional claim, a federal court may grant an application for a writ of habeas corpus only if

> the adjudication of the claim (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  "This is a difficult to meet, . . . and highly deferential standard for evaluating state-court rulings, which demands that state court decisions be given the benefit of the doubt."  *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (internal quotation marks and citations omitted).

To determine whether a state-court decision is contrary to clearly established Supreme Court precedent, the federal court must consider whether the state court decision "'applies a

rule that contradicts [such] law' and how the decision 'confronts [the] set of facts' that were before the state court." *Pinholster*, 563 U.S. at 182 (quoting *Williams v. Taylor*, 529 U.S. 362, 406 (2000)) (alterations in original).  A state court decision involves an unreasonable application of clearly established Supreme Court precedent if it correctly identifies the governing legal principle but unreasonably applies or unreasonably refuses to extend that principle to the facts of a particular case.  *See Williams*, 529 U.S. at 413; *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000).

Under the AEDPA, a state court's factual findings are presumed correct, unless that presumption is rebutted by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).  If the state court failed to decide a claim "on the merits," the pre-AEDPA standard of review applies, and both questions of law and mixed questions of law and fact are reviewed *de novo. Washington v. Shriver*, 255 F.3d 45, 55 (2d Cir. 2001).  Finally, the Supreme Court has held that circuit and district court decisions do not constitute "clearly established Federal Law, as determined by the Supreme Court." *Parker v. Matthews*, 567 U.S. 37, 40 (2012).  Instead, circuit court decisions may illustrate the "possibility" of fairminded disagreement, sufficient to justify denying the writ.  *White v. Woodall*, 572 U.S. 415, 422 n.3 (2014).

### B.    Claim One: *Brady* Violation

Here, petitioner alleges, as he did in his direct appeal and collateral challenge, that the prosecution violated its *Brady* obligations by failing to provide petitioner with impeachment material for one of their trial witnesses, Sheridan.  *See* Pet. at 2-4; Reply at 10, 13-19.  The Third Department rejected these arguments, holding that petitioner failed to carry his burden of demonstrating prejudice, namely that, had the suppressed evidence been presented at trial, there was a reasonable possibility that a different verdict would have occurred.  *Wilkins*,

15

216 A.D.3d at 1366-67.  Accordingly, there has been a state court decision, on the merits, concerning the *Brady* issue, and AEDPA deference applies.

This Court has previously explained that a petitioner's due process rights can be violated by a prosecutor's failure to produce evidence.

> Prosecutors must disclose to an accused exculpatory information in their possession that is favorable to the defense and material to guilt or punishment, *Brady [v. Maryland]*, 373 U.S. [83,] 87 [(1963), and evidence affecting the credibility of a witness, where the reliability of the witness could determine guilt or innocence, *Giglio v. United States*, 405 U.S. 150, 154 (1972).

*Major v. Lamanna*, No. 9:18-CV-0418 (DNH/TWD), 2021 WL 4267851, at *18 (N.D.N.Y. Sept. 3, 2021), *adopting Report and Recommendation*, 2022 WL 408819 (N.D.N.Y. Feb. 10, 2022).  However, not every failure to disclose information constitutes a constitutional violation.  *See Strickler v. Greene*, 527 U.S. 263, 281 (1999).

"To establish a *Brady* violation, a [petitioner] must show (1) that the evidence at issue is favorable to [him], either because it is exculpatory, or because it is impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued."  *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006) (citing *Strickler*, 527 U.S. at 281-82) (internal quotation marks omitted).  *Brady* is not violated "unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."  *Strickler*, 527 U.S. at 281.

A petitioner bears the burden of proving that the prosecution withheld material information.  *Harris v. United States*, 9 F. Supp. 2d 246, 275 (S.D.N.Y. 1998).  "Conclusory allegations that the government 'suppressed' or 'concealed' evidence do not entitle [the petitioner] to relief."  *Id.* (quotations omitted); *see also Mallet v. Miller*, 432 F. Supp. 2d 366, 378 (S.D.N.Y. 2006) (*Brady* claim dismissed where supported only by conjecture); *Flynn v.*

16

*Colvin*, No. 9:13-CV-1247 (JKS), 2016 WL 7053582, at *6 (N.D.N.Y. Dec. 5, 2016) ("It is well-settled in this Circuit that vague and conclusory allegations that are unsupported by specific factual averments are insufficient to state a viable claim for habeas relief.") (citation omitted).

Given said deference, the Court agrees with respondent that the Third Department's rejection of petitioner's claim was reasonable. All parties agreed that Sheridan's disciplinary materials were impeachment evidence that should have been disclosed to petitioner's defense attorney. *Wilkins*, 216 A.D.3d at 1365-66. Accordingly, the Third Department focused on the final factor in the *Brady* analysis – the materiality of the Sheridan's testimony regarding the presence of the victim's DNA on petitioner's blood-stained t-shirt – and properly applied said factor, concluding that petitioner's guilty verdict did not hinge upon Sheridan's testimony. *Id.* at 1366. Instead, "[t]he resolution of th[e] case was almost entirely dependent on the jury's credibility determinations concerning the account of the altercation and [petitioner]'s justification for his actions." *Id.* The victim identified petitioner as his assailant, and the evidence was uncontroverted that petitioner was involved in the fight and possessed a knife during it. *Id.* Consequently, there was not any argument that petitioner and the victim were in close proximity to each other, while the victim was critically injured and bleeding profusely, and petitioner had possession of the knife. Instead, the question was whether petitioner was justified in his actions given the threat he perceived to himself and his brother.

As the Supreme Court recently explained "even if undisclosed evidence entirely discredits a prosecution witness, the failure to turn over the evidence is not material if considerable other evidence links the [petitioner] to the crime and the record provides strong support that the [petitioner] would have been convicted anyway." *See Klein v. Martin*, 607 U.S. 213, 222 (2026) (internal quotation marks, citations and modifications omitted); *but see*

17

*United States v. Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998) (explaining that "evidence whose function is impeachment may be considered to be material where the witness in question supplied the only evidence linking the [petitioner] to the crime.") (citing cases). Here, even if Sheridan was completely discredited as a prosecution witness, there is no reasonable possibility that the verdict would have changed given the other evidence presented.

Petitioner disagrees with this assessment, arguing that the evidence against him was not overwhelming because (1) of the ten to twenty people that were in and around the fight, only four of those witnesses testified, and that testimony exposed several inconsistencies about what occurred; and (2) the prosecution recognized the importance of Sheridan's forensic evidence by emphasizing it during the summation and creating a chart of the results for the jury. Reply at 16-17. However, the Court does not find petitioner's assertions persuasive. For the reasons previously articulated, this Court cannot identify an unreasonable application of federal law by the state courts in this case. In sum, the "undisclosed impeachment evidence [about Sheridan's discipline] is not material in the Brady sense [because], although possibly useful to [petitioner's] defense, it [wa]s not likely to have changed the verdict. *Carter v. Ercole,* 338 F. App'x 43, 45 (2d Cir. 2009) (internal modifications and quotation marks omitted) (citing cases). Consequently, the undisclosed impeachment evidence against Sheridan does not justify the habeas relief requested.

### B.    Claim Two: Ineffective Assistance of Counsel[4]

---

[4]  Respondent argues that portions of petitioner's ineffective assistance of counsel claim are unexhausted and procedurally barred. Dkt. No. 17-1 at 25. Because the undersigned has determined that they are clearly meritless, the procedural arguments will not be further discussed.

Petitioner claims that his pretrial counsel was constitutionally ineffective for (1) "failing to submit any argument in support of [petitioner's] suppression motion;" and (2) antagonizing the County Court and taking "such a hostile demeanor with [it] that [counsel] was almost held in contempt."  Pet. at 5-6; *see also* Reply at 20-21.  Additionally, petitioner contends that his trial counsel did not make proper objections (1) to the victim's testimony indicating that petitioner had intentionally stabbed his brother or (2) during his brother's testimony when the prosecution was intimating that Jamel associated with, and was a member of, a gang.  Pet. at 7; *see also* Reply at 21.  Finally, petitioner contends that his trial counsel did not properly cross-examine Sheridan about the "absolutely crucial" DNA evidence to "weak[en] . . . her qualifications, experience, testing methodology, etc."  Pet. at 7; *see also* Reply at 21.

To establish that counsel was constitutionally ineffective, a petitioner must demonstrate (1) "that counsel's performance was deficient" and (2) "that the deficient performance prejudiced the defense."  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To prove deficiency, "a person . . . must show that 'counsel's representation fell below an objective standard of reasonableness.'"  *Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  Under the second prong, "a [petitioner] must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting *Strickland*, 466 U.S. at 694).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Strickland*, 466 U.S. at 694.  An ineffective assistance of counsel claim must be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697 (explaining courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).

19

"Surmounting *Strickland's* high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

As with the *Brady* issue, the Third Department also considered petitioner's ineffective assistance claims during his appeal.  *Wilkins,* 216 A.D.2d at 1364-66.  "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult."  *Harrington*, 562 U.S. at 105.  When evaluating an ineffective assistance claim on habeas review, "the question is not whether a federal court believes the state court's determination under the *Strickland* standard was incorrect[,] but whether that determination was unreasonable – a substantially higher threshold."  *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations omitted).  In sum "a federal court may grant relief only if *every* fairminded jurist would agree that *every* reasonable lawyer would have made a different decision."  *Dunn v. Reeves*, 549 U.S. 731, 739 (2021); *see also Harrington*, 562 U.S. at 105 ("When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.").

### i.    Pretrial Counsel Bryan Round's Attitude Toward the County Court During the Suppression Hearing

Petitioner first contends that his pretrial counsel was unnecessarily antagonizing and hostile with the County Court, so much so that Round was almost held in contempt.  Reply at 20.  In deciding this claim, the Third Department acknowledged "contentious exchanges with [the] County Court;" however, it ultimately denied petitioner's claim because "there is no indication that [petitioner's pretrial counsel's] remarks had any adverse effect on the representation or resulted in unfavorable rulings or unfair treatment by the court."  *Wilkins*, 216 A.D.3d at 1364.

20

While best practice calls for a level of decorum with the court, there is no guarantee that a different demeanor would have precluded some of tension which occurred.  This is because the Third Department's characterization of the county court as "contentious" was consistent with how the county court's described itself to those appearing before it.  The judge indicated that he had "the reputation of being a nasty judge, a little bit right of Attila the Hun."  Dkt. No. 17-4 at 931.  Further, the judge treated all attorneys appearing before him similarly.  Notably, the county court judge admonished both the prosecution and defense trial attorney (Cohen) – while they were casually joking about who would pay the stenographer for the overnight transcript costs – about their distasteful humor and presumably unprofessional conduct, reminding the attorneys that the court "easily [could have] held people in [their] office in contempt."  *Id.* at 852-53.

Finally, even assuming it was reasonable for pretrial counsel to have acted differently, petitioner fails to allege, must less prove, that he suffered prejudice as a result.  At best, petitioner's claim relies on vague and conclusory arguments which are insufficient to establish ineffective assistance.  *See Scott v. Racette*, No. 1:15-CV-0043, 2018 WL 451825, at *7 (W.D.N.Y. Jan. 17, 2018) (collecting cases).

### ii. Pretrial Counsel Bryan Round's Failure to Submit a Memorandum of Law

Petitioner contends that Round was constitutionally deficient during the suppression hearing because he failed to (1) submit a memorandum of law at the end of the hearing, rendering all of petitioner's arguments unpreserved for appeal; (2) argue that petitioner was in a coercive environment; (3) argue that law enforcement's confrontation of petitioner, after taking his polygraph test, undermined the voluntariness of petitioner's statements; and (4) argue that there was no probable cause to detain petitioner prior to his

polygraph.  Reply at 20.

First, petitioner relies upon *People v. Clermont*, 22 N.Y.3d 931 (2013) for the proposition that he is entitled to relief because his pretrial counsel did not supply the county court with a memorandum of law, as instructed, at the conclusion of the suppression hearing. Reply at 21.  However, petitioner oversimplifies and misconstrues the holding in *Clermont*.  In addition to counsel's "failure to make appropriate argument in his motion papers or to submit a post-hearing memorandum," counsel in *Clermont* also "misstated the facts related to the arrest," and failed to "marshal the facts for the court and ma[k]e [any] legal argument[s]," during the suppression hearing.  *Clermont*, 22 N.Y.3d at 933.  This constellation of errors was further evidenced by counsel's request "to be relieved, informing the court that [counsel] was unable to provide competent representation to [the] defendant."  *Id.* at 933-34.  This is not the case in the instant action.  Petitioner's pretrial counsel actively and competently cross-examined the prosecution's witnesses, as well as proffered various arguments before the Court, resulting in all the evidence which was gathered from petitioner's cell phone being suppressed.  SCR at 69.

Furthermore, petitioner misstates the facts upon which his suppression motion was denied.  Despite the lack of a memorandum of law, the county court judge authored a detailed decision denying various, specific, suppression arguments on the merits.  SCR at 62-70.  In a footnote to that decision, the county court judge noted that an alternative holding was that the defense waived its right to a determination of the suppression motion by failing to submit any written arguments.  SCR at 70.  While the information contained in footnotes is important, it does not erase the substantial merits analysis and reasoning that the county court provided which comprised the entire body of the written decision. Furthermore, the

Third Department then considered petitioner's suppression arguments and found that petitioner did not suffer any prejudice from his pretrial counsel's actions because there was no indication that his suppression motion would have been successful. *Wilkins*, 216 A.D.2d at 1364. Thus, contrary to petitioner's contentions, the merits of his suppression arguments were considered on appeal. Consequently, any assertion that petitioner's pretrial counsel's failure to produce a memorandum of law prejudiced petitioner because it precluded appellate courts from evaluating his suppression hearing claims is unpersuasive.

Second, as the Third Department noted, the submission of a formal memorandum would not have changed any of petitioner's outcomes. Specifically, Petitioner argued that his continued interviews in the police barracks created a coercive environment which encouraged his "inculpatory statements [to] first occur after he [wa]s told by Investigator Jordan that the polygraph suggested he was not being truthful," Pet. at 6. However, "[b]eing confronted with polygraph results – without more – does not demonstrate that subsequent statements were provided under coercion. This absence of any connection – express or implied between the polygraph and the subsequent statements demonstrate that [petitioner's] statements were made voluntarily and the original knowing and repeated waivers of his *Miranda* rights remained valid." *United States v. Mendonca*, No.18-CR-0671, 2020 WL 854584, at 85 (E.D.N.Y. Feb. 4, 2020).

Petitioner also contends there was no probable cause to support his arrest, which he felt occurred when he was handcuffed on the way to the polygraph around 11:45 a.m. Pet. at 6. This was hours after Irving had identified petitioner as the attacker. Accordingly, because there was an eyewitness who had specifically identified petitioner as the perpetrator, any argument challenging probable cause would have been denied. *See e.g. Mara v. Rilling*, 921

F.3d 48, 73-74 (concluding that an eyewitness account is sufficient to plainly establish probable cause); *Carson v. Lewis*, 35 F. Supp. 2d 250, 260 (E.D.N.Y. 1999) ("[A]n unequivocal identification of a suspect received by police from a[n] . . . eyewitness can provide probable cause[.]" (citations omitted).

Therefore, the state court reasonably applied *Strickland* to the facts of petitioner's suppression hearing and correctly determined that petitioner has suffered no prejudice because petitioner's purported arguments were "unpersuasive[] and . . . reveal[ed] no indication that the motion had a substantial chance of success." *Wilkins*, 216 A.D.3d at 1364.

### iii.    Trial Counsel Mikael Cohen's Failure to Object

Petitioner argues that his trial counsel, Cohen, made several mistakes when he failed to object to various testimony throughout the trial. The first instance was when the victim, Huggan, testified that petitioner had stabbed his brother, Kamel, on purpose. Pet. at 7; Reply at 21. Petitioner states this testimony indicated an uncharged bad act that, liberally construing petitioner's argument, undermined his theory of self-defense. Pet. at 7; Reply at 21. The second instance was when Cohen did not intervene during the prosecution's cross-examination of Kamel, where the prosecution asked Kamel about his participation posing in various photographs alluding to a gang affiliation. Pet. at 7; Reply at 21.

With respect to the first instance, as argued by respondent, petitioner again mischaracterizes what happened. Huggan immediately clarified his belief that petitioner's brother was stabbed accidentally. Dkt. No. 17-4 at 630-31. When the prosecution attempted to again explore and reemphasize that the stabbing was accidental, petitioner's counsel successfully objected to the question. Dkt. No. 17-4 at 632. Therefore, the jury heard the victim clarify his belief that the stabbing of petitioner's brother was accidental, as well as saw

24

the petitioner's attorney successfully object to any further discussion on the matter. Accordingly, any potential prejudice petitioner thinks he may have suffered by Cohen not immediately objecting to a question about what the person stabbing Kamel was thinking was alleviated with the correction. *United States v. Castilo*, 277 F. App'x 77, 80 (2d Cir. 2008) (holding that any potential prejudice from an error counsel made in failing to point out a mistake in a presentence report was alleviated when "the government attorney corrected [it] in open court[.]").

Moreover, as is applicable to petitioner's entire claim, this Court has already held that:

> [T]he Second Circuit has explained, counsel's decisions about "whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 321 (2d. Cir. 1987), *cert. denied*, 484 U.S. 958 (1987); *see also United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974) ("the decision to call or bypass particular witnesses is peculiarly a question of trial strategy ... which courts will practically never second-guess.") (first citing *United States v. Matalon*, 445 F.2d 1215, 1219 (2d Cir. 1971), *cert. denied*, 404 U.S. 853 (1971); then citing *United States v. Garguilo*, 324 F.2d 795, 797 (2d Cir. 1963)), *cert. denied*, 417 U.S. 972 (1974).
>
> Such "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]" *Strickland*, 466 U.S. at 690.  Moreover, neither Petitioner's disagreement with counsel's strategic decision nor that the strategy utilized was unsuccessful are sufficient to prove counsel was ineffective.  *See Lalonde v. Thomas*, No. 9:20-CV-1561 (GTS), 2022 WL 1303918, at *19 (N.D.N.Y. May 2, 2022) ("While a petitioner may disagree with trial counsel's strategy, counsel is not ineffective merely because a strategy he/she employed was unsuccessful.") (collecting cases); *Backus v. Nichols*, No. 9:04-CV-0356 (TJM/GHL), 2008 WL 413295, at *12 (N.D.N.Y. Feb. 13, 2008) ("[t]o the extent [the petitioner]'s claim suggests a disagreement with counsel's strategy, '[a] petitioner cannot prevail on a claim of ineffective assistance merely because he disagrees with his counsel's strategy.' ") (quoting *Bussey v. Greiner*, No. 1:02-CV-8642, 2007 WL 2589454, at *8 (S.D.N.Y. Aug. 28, 2007)) (additional citation omitted).

25

*White-Span v. Corey*, No. 9:21-CV-1292 (DNH), 2024 WL 81406, at *16 (N.D.N.Y. Jan. 8, 2024), *appeal dismissed,* No. 24-350, 2024 WL 3745541 (2d Cir. July 26, 2024).  The same holds true here and is consistent with the Third Department's decision that petitioners concerns with "the scope of [his] trial counsel's direct and cross-examination of certain witnesses or his failure to object to certain remarks by the People are merely reflective of [petitioner's] disagreement as to trial counsel's strategies and tactics weighted with the benefit of hindsight."  *Wilkins*, 189 N.Y.S.3d at 1365 (internal quotation marks and modifications omitted).  As the state court reasonably determined, petitioner's retrospective disagreement with the way Cohen did or did not interject during examination of the witnesses during the trial is not sufficient to deem petitioner's representation constitutionally ineffective.

### iv.     Trial Counsel Mikael Cohen's Failure to Further Cross-Examine Sheridan

Finally, petitioner contends Cohen's failure to more intensely cross-examine Sheridan about her "absolutely crucial" DNA testimony and the "potential weaknesses in her qualifications, experience, [and] testing methodology," rendered his representation deficient. Pet. at 1; Reply at 21.  As explained above, the Third Department reasonably applied federal law in deeming such disagreements with trial tactics insufficient to establish ineffective assistance.

Further, petitioner has failed to demonstrate any specific prejudice.  Sheridan's testimony about Huggan's DNA being found on petitioner's t-shirt established that, consistent with the testimony from several witnesses, petitioner and the victim were in close contact with one another.  However, petitioner fails to establish how or why further questioning about the DNA would have changed the outcome of the trial.  In reality, "DNA [alone] . . . would not

26

require the jury to accept petitioner's testimony that []he was acting in self-defense.  Much

more than that would be necessary for the jury to accept the self-defense theory." *Powers v.

Lord*, 462 F. Supp. 2d 371, 380 (W.D.N.Y. 2006).  Moreover, Cohen did use Sheridan's

testimony about the location of the blood/DNA in his summation, arguing that its location was

inconsistent with petitioner's version of events.  Petitioner fails to address how and why

Cohen's use of that information was contrary to his defense or how further questioning would

have resulted in a different jury verdict.  In sum, petitioner failed to provide any evidence that

additional cross-examination would have generated a different outcome.

### v.    Mikael Cohen's Overall Performance

The Third Department ultimately concluded that petitioner's representation at trial

> was far from deficient. To this end, the record reveals that counsel
> made appropriate opening and closing statements, *1365  engaged
> in effective cross-examination of the People's witnesses which
> highlighted any inconsistencies in their accounts of the altercation,
> successfully advocated for a missing witness charge, pursued a
> cogent and strategic theory based upon a justification defense, and,
> ultimately, counsel's efforts resulted in an acquittal of one of the two
> charged felonies.

*Wilkins*, 216 A.D.3d at 1364-65.  This conclusion was reasonable given the facts of the case

and prevailing federal precedent.  Even if petitioner could establish an isolated error in by

Cohen, "it is difficult to establish ineffective assistance when counsel's overall performance

indicates active and capable advocacy." *Richter*, 562 U.S. at 111.

Here, as identified by the Third Department, petitioner's trial counsel pursued a clear

strategy – arguing that petitioner was not the aggressor and instead was acting in self-

defense – and successfully moved for a missing witness and justification instruction which

resulted in an acquittal of the most serious count in the indictment.  Accordingly, the state

27

court reasonably applied federal law in determining that petitioner's representation was constitutionally effective.

## V.      CONCLUSION

**WHEREFORE**, it is

**ORDERED** that the petition, Dkt. No. 1, is **DISMISSED AND DENIED**; and it is further

**ORDERED** that the Court declines to issue a Certificate of Appealability.  28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003))).  Any further request for a Certificate of Appealability must be addressed to the Court of Appeals.  *See* Fed. R. App. P. 22(b); 2d Cir. R. 22.1.

**ORDERED** that the Clerk serve a copy of this Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

Dated: July 29, 2026

Glenn T. Suddaby
U.S. District Judge

28